86 So.2d 918

Amos B. JANTZ, I. E. Stephens and Glen
G. Goodwin

v.

The LONG BELL PETROLEUM COMPANY,
Inc. et al.

No. 42097.

Feb. 20, 1956.

Rehearing Denied March 26, 1956.

Plauche & Stockwell, Lake Charles, for
plaintiffs-appellants.

Jesse Andrews, Houston, Tex., W. E.
Slagle, Kansas City, Mo., LeCompte, Hall
& Coltharp, De Ridder, for defendant-ap-
pellee.

PONDER, Justice.

After a careful study of the rec-
ord in this case, the oral arguments ad-

vanced on this appeal and the briefs filed in support thereof, we have arrived at the conclusion that the trial judge has correctly stated the facts, the law applicable thereto and correctly disposed of all the issues raised; and we, therefore, adopt his opinion as the opinion of this Court, viz.:

"These three plaintiffs, respectively, instituted these three jactitory actions, each one, respectively, claiming to be the owner of the tract of land described in his petition and allege that defendant is slandering plaintiff's title by claiming to be the owner of the oil, gas and other minerals in, on and under the lands described in the petition.

"The defendant (the same in each case) alleging that plaintiff does not now have and has not had, possession of the minerals relating to the respective tracts of land, filed, in limine, in each case, an exception of lack of or want of possession in plaintiff and prayed that plaintiff's suit be dismissed at his costs, all as provided by Act 241 of 1946, now incorporated in LSA–R.S. 13:- 5063.

"The three cases, for the purpose of the trial of the exceptions, were consolidated, with the agreement that separate judgments be rendered, in either parish of the district, in chambers or in open court, in vacation or in term time, and that orders of appeal be granted to the party cast, without the necessity of formal motion, the successful litigant waiving notice of judgment and notice of appeal.

"The exceptions are now before the court for decision, they having been submitted on briefs, the last of which was filed August 10, 1954.

"The facts, as disclosed by the records, are:

"By deed dated December 29, 1931, Long-Bell Lumber Sales Corporation, conveyed to Long-Bell Minerals Corporation all of the oil, gas and other minerals in, on and under and that may be produced from a large tract of land, situated in Beauregard Parish, and described in the deed, amongst which was that described in these three petitions, the deed being filed in evidence and marked 'E–1'.

"By instrument dated February 27, 1936, filed in evidence by exceptor, and marked 'E–2', Long Bell Minerals Corporation and Long Bell Petroleum Company, Inc., were merged, the name of the surviving corporation being 'The Long Bell Petroleum Company, Inc.' The effect of this instrument of merger was that the minerals corporation ceased to exist and its holdings, including the servitude created by the deed of December 29, 1931, ('E–1') became vested in the Long Bell Petroleum Company, Inc.

"It was stipulated (See Exhibit 'E–7') that The California Company, as the lessee of the Long Bell Petroleum Company, Inc., under lease dated February 15, 1939, filed in evidence and marked 'E–3', drilled a well to a depth of 10,692 feet, at which depth there was a reasonable hope of discovery, on

"E½ of SW¼ of SE¼ Section 23, Township 4 South, Range 9 West,

in a good faith effort to produce oil, gas or other minerals which well was abandoned as dry in August of 1939. The land on which this well was drilled is a part of the large tract on which the servitude was established by the deed 'E–1', dated December 29, 1931, as are the three tracts described in these three suits and the land on which this well was drilled and the land described in these three cases are contiguous, that is, one can pass from this drill site to the lands in the tracts described in these three law suits without passing over any land other than as is described in Exhibit 'E–1'.

"The same stipulation admits another well was drilled by the same lessee, on

"SE¼ of NE¼, Sec. 12, Twp. 5 South, Range 10 West,

and abandoned as dry in December, 1939, the well being drilled to a depth of 10,712 feet, under a lease dated December 15, 1939, filed in evidence marked 'E–4'. The same additional admissions were made as to the good faith, etc., as were made as to the well described in the preceding paragraph hereof and the same thing may be said as to the contiguity of the drill site and the respective tracts of land described in the respective petitions.

"The stipulation also admits that on December 11, 1946, Barnsdall Oil Company (Now Sunray Oil Company) completed a producing well on

SW¼ of NE¼ of Sec. 1, Twp. 6 South, Range 10 West,

the well being drilled under a lease from this defendant and The Long Bell Lumber Company, dated April 22, 1946, filed in evidence and marked 'E–5'. The forty-acre tract upon which this well was completed forms part of the large tract upon which the servitude was established by exhibit 'E–1', dated December 29, 1931, and, like the two drill sites hereinabove mentioned, is contiguous to the three tracts described in these three law suits. Exhibit 'E–6' is the assignment of the lease under which Barnsdall drilled this producing well to Sunray Oil Corporation.

"The uncontradicted testimony of the witness, Pleimann, Chief Clerk of Sunray Oil Corporation, shows that the well described in the preceding paragraph is still producing oil.

"The plaintiffs in the three suits acquired the lands described in their petitions, respectively, by deed executed by Long-Bell Farm Land Corporation and The Long Bell Petroleum Company, Inc., to the respective plaintiffs, or to the immediate grantor of these plaintiffs, all more than two (2) years prior to the institution of these suits, except that Mr. Jantz acquired one of his forties (SE¼ of NE¼ Sec. 4, Twp. 4 S, R 9 W) from Jonas Unruh, by deed dated September 21, 1953, (see 'J–4'), Unruh having acquired it by deed dated January 15, 1942,

executed by Long-Bell Farm Land Corporation and The Long Bell Petroleum Company, Inc., see exhibit 'Jantz–2', the instrument covering Mr. Stephens' title having been filed in evidence and marked 'S–1', and the deeds filed in connection with the Goodwin title being marked 'G–1' and 'G–2'.

"Each of the deeds which were executed by Long-Bell Farm Land Corporation and The Long Bell Petroleum Company, Inc., to the respective plaintiffs, or their authors in title, contained the following clause:

" 'There is hereby expressly reserved unto the Long Bell Petroleum Company, Inc., its successors and assigns, all of the oil, gas and minerals beneath the surface of all of the land above described, with full and exclusive rights and authority to exercise all reasonably necessary means for the prospecting, exploring and developing of such oil, gas and other minerals, including such right of access to the use of the surface of said land as may be necessary or incidental to this reservation; provided, however, that the Vendee, or his heirs or assigns, shall not be required to remove any buildings or other improvements placed or made upon said land, and provided further that in the exercise of said reservation reasonable compensation shall be made for damage caused to said land and improvements and growing crops thereon, and reasonable rentals shall be paid for such of said land, if any, as may be used exclusively for such purposes.'

"It is proper to note here that the above quoted reservation is exactly the same as that contained in the deeds involved in the case of Long Bell Petroleum Co. v. Tritico, and quoted in the opinion in that case [216 La. at page 431], at page 784 of 43 So.2d.

"As to the Goodwin land, he testified (Tr. 10) that he has had his tract fenced since October, 1949, and that no wells have been drilled on it. His actual possession of the land he claims is not disputed.

"Plaintiff, Stephens, testified (Tr. 15) that he has paid the taxes on the land ever since he bought it; that shortly after he bought it some eleven years ago, he 'pushed' the stumps off it and 'it has just been laying out and I have been trying to raise a few pines on it'. 'I intend to farm it in the future'. In answer to the court's question as to what he had done with the land during the past year, the plaintiff answered 'Nothing, I haven't done nothing, other than trying to raise a few pines on it and avoid fires', and he said that consisted of 'well, keeping watch on it to see that no fires broke out on my side of the road'. However, he did initiate an actual possession which may be continued by constructive or civil possession. (Suc[cession] of Shelley [La.App.], 180 So. 452.)

"The Jantz suit involves the minerals in three forties—SE¼ of NW¼ and SW¼ of NW¼, Sec. 3, and SE¼ of NE¼, Sec. 4, all in Twp. 4 S, Range 9 West.

"Mr. Jantz acquired the SE¼ of NE¼ of Sec. 4 from Jonas Unruh, by deed dated September 21, 1953, see exhibit 'Jantz–4', Unruh having acquired it by virtue of a deed executed by Long Bell Farm Land Corporation and Long Bell Petroleum Company, Inc., dated January 15, 1942, see exhibit 'Jantz–2'.

"The other two forties of the Jantz were acquired in deeds executed by the two above named corporations directly to Jantz, one dated August 18, 1937 (Jantz–1) and the other dated May 15, 1947 (Jantz–3).

"Mr. Jantz testified that he had had the two forties he purchased from the corporation under fence for about ten (10) years, while the forty he purchased from Unruh is not fenced. Since he acquired the Unruh 40 in September, 1953, Mr. Jantz's son-in-law built a house on that 40 and lives on it. The court maintained exceptor's objection to plaintiff, Jantz, attempt to show Unruh's possession, because no allegation of Unruh's possession was contained in the petition (Ledet v. Ledet [La.App.], 192 So. 551), and Jantz had testified that such possession as he had exercised had been subsequent to his purchase on September 21, 1953.

"From the facts appearing in the record the court believes that both Goodwin and Stephens had, at the time of the institution of the suits and had had for more than two years, sufficient actual possession of their respective tracts of land to enable them to maintain the jactitation or slander of title action as to the land, itself, were possession of the land, alone, involved, and the same thing can be said as to the two forties of the Jantz tract purchased directly from the two corporations, but as to the other forty, purchased from Unruh, Mr. Jantz could not maintain either a possessory action or action in jactitation, since he has not had the required possession.

"However, the slander of title claimed does not concern either tract of land, as such, and the possession of the land, itself, as the court sees it, is immaterial except to the extent that such possession may effect the possession of the underlying minerals or the mineral servitude, the object actually involved in the suits, the court not being permitted to consider the question of title, in a jactitory action except to the extent necessary to determine whether plaintiff is really in possession as owner. International Paper Co. v. Louisiana Central Lumber Co. [202 La. 639], 12 So.2d 659.

"It has often been argued and, with some degree of logic, that the jactitory action should not lie to vindicate possession of mineral rights, which, under our law, is a servitude, for the reason that the action is founded on *actual physical* possession, a mineral right being incapable of such possession. However, the court long ago set that issue at rest. The rule which the court applies in determining whether one has possession of a mineral right is based on Article 3432 of the LSA–Civil Code, which provides in part, as follows:

" 'The possession of incorporeal rights, such as servitudes and other rights of that nature, is only a quasi possession, and is exercised by the species of possession of which these rights are susceptible.'

And it has been held, in construing this article, that possession by the exercise of rights under a mineral servitude prevails over a landowner's claim to possession by virtue of the fact that he has a deed which is translative of title *even* to both land and minerals. Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Lenard v. Shell Oil Co., 211 La. 265, 29 So.2d 844. And the same cases hold that the possession which the mineral owner acquires through the exercise of his mineral rights excludes the landowner from the possession of the minerals under any part of the land covered by the mineral owners' title.

"The Lenard case, particularly, is appropriate to the main facts in this case. In that case the owner of a very large tract of land (80,000 acres) sold it, reserving the minerals. The land purchaser sold 30 acres of the 80,000 (the 30 acres being a part of a 20,000 acre continuous tract) acres to Lenard, before any well was drilled on the large tract, making no mention of the minerals. Subsequent to the sale of the land to Lenard, lessees of the mineral owner drilled several dry holes on the large tract, at points distant from the Lenard 30 acre tract. After the lapse of 10 years, no operations having been conducted on the 30

acre tract, Lenard brought a slander of title action against the mineral owners, claiming possession of the minerals, by virtue of his possession of the land (and under a deed making no mention of a mineral reservation) but the Supreme Court, through the Chief Justice, held that the drilling on any part of a continuous tract, constitutes exercise of the servitude on the whole, citing Lee v. Giaque, 154 La. 491, 97 So. 669; Frost Lumber Industries v. Republic Production Co. [5 Cir.], 112 F.2d 462, loc. cit., page 465, and that the exercise of the servitude on part of the large acreage constituted such possession as to preclude the possession of the minerals claimed by the plaintiffs in the 30 acre tract.

"In the Lenard case, Chief Justice O'Niell cited the case of International Paper Co. v. Louisiana Central Lumber Co., 202 La. 621, 12 So.2d 659 [660], upon which defendant, in these cases, mainly and this court believes, justifiably, relies.

"In that case, Chief Justice O'Niell was again the organ of the court. Citing a long line of cases, he pointed out that:

" 'A jactitation suit, or an action for slander of title, can be maintained only by one who is in actual possession *as owner*, and only against one who is not in possession, of the property the title to which is sought to be quieted.' (Emphasis added.)

"It was also pointed out by the Chief Justice that in such a suit the title or owner-

ship of the property involved, whether corporeal or incorporeal, is not in contest, and is not to be considered by the court except to the extent necessary to determine whether the plaintiff is really in possession as owners.

"I quote further from the International Paper Company case ([12 So.2d] page 662) as follows:

" 'The plaintiff depends upon the rule that one who has possession of the surface of a tract of land as owner may maintain a jactitation suit against one who slanders the possessor's title by claiming mineral rights in the land. But that rule has its qualifications, one of which is that if the possessor of the land holds under a deed which on its face excepts the mineral rights, or if the so-called slanderer holds a recorded deed for the mineral rights, the possessor of the surface of land—in order to maintain his jactitation suit—must allege and make a prima facie showing that the outstanding claim of the slanderer for the mineral rights has been extinguished by the prescription of ten years liberandi causae. In such a case the possessor of the surface as owner of the land cannot maintain a jactitation suit against a defendant who has a recorded deed for the mineral rights if the defendant is actually and adversely possessing or exercising the mineral rights. Mineral rights and mineral leases are by Act 205 of 1938 "de-

fined and classified as real rights and incorporeal immovable property, and may be asserted, protected and defended in the same manner as may be the ownership or possession of other immovable property by the holder of such rights". It is declared in article 3432 of the Civil Code that possession of incorporeal property, such as servitudes, is had by the exercise of such rights. See Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Allison v. Maroun, 193 La. 286, 190 So. 408; and In re Mt. Forest Fur Farms of America, Inc., 122 F.2d 232, where the United States Circuit Court of Appeals for the Sixth Circuit reviewed extensively the law of Louisiana recognizing that mineral rights are subject to actual possession, adverse to the possessor of the land itself, by the exercise of such rights.'

"It seems clear to this court that, unless there is some factual situation in these three cases to distinguish them from the Lenard case and the International Paper Company case, so as to make the law of those cases inapplicable to the present cases, the judgments here must be the same as they were in those cases, that is that plaintiffs have not possession of the mineral rights in the respective tracts and that defendant has, hence, that plaintiffs cannot maintain these jactitory actions.

"Counsel for plaintiffs, defendants in the exception, contend that exceptor should have set up in the exception of want of

possession, the facts upon which it relies to show (1) that defendant is in possession and (2) that plaintiffs are not in possession. This court does not understand such to be a requirement of the law.

"Until the passage of Act 241 of 1946, LSA–R.S. 13:5063, the question of possession in such actions as those could be placed at issue merely by denying the allegation of possession, or even by a general denial. Apparently the only purpose of the 1946 Act was to force the trial of the issue of possession, when such an issue was to be raised, to be had in limine.

"The exceptions in these cases, filed in limine litis, as the statute requires, denied plaintiff's possession of the minerals, and, therefore 'raises and pleads such defense by means of and in an exception filed in limine litis,' to quote from the statute.

"The court is of the opinion that this phase of plaintiffs' defense to the exceptions is without merit.

"Plaintiffs' counsel also contend, in effect, in their brief, that when defendant joined with Long-Bell Farm Land Corporation in the execution of the deeds to the respective plaintiffs, a new or separate servitude was thereby created as to each tract covered by the separate deeds, and that the land conveyed by those separate deeds became thereby no longer subject to the servitudes created on the large tract of which these smaller tracts form parts, by the deed dated December 29, 1931 (E–1). To agree with this view would necessitate the court's overruling of the Supreme Court's holding (on rehearing) in the case of Long-Bell Petroleum Company, Inc. v. Tritico, 216 La. 426, 43 So.2d 782, 792, and that, of course, a district court cannot do, even if it had any desire to do so, which this court doesn't have. In the Tritico case, the Supreme Court held that the reservations appearing in the deeds involved in that case, which deeds were executed by the same grantors as in the deeds here under consideration, and contained identically the same mineral reservation, were without effect and were placed in those deeds, for the protection of the vendees against any damages and inconveniences they might suffer through use of the servitude and as a protection to Long-Bell Farm Corporation under its warranty. Chief Justice Fournet, said, in that case:

" 'It is our opinion that the clause contained in the two deeds was intended for the protection of the vendor Long-Bell Farm Land Corporation under its warranty, and also for the protection of the vendees against damage or inconvenience they might suffer through the use of the servitude. Hence the reason for the appearance of the Petroleum Company in those deeds.'

"Counsel also argue that if an entirely new servitude was not created by the deeds under which these three plaintiffs acquired their respective tracts, the servitude created

by the deed of December 29, 1931, (E-1) was thereby divided, in the sense that the original servitude became a separate one as to each of those individual tracts. In support of this particular postulation, they cite the cases of Elson v. Mathewes, 224 La. 417, 69 So.2d 734, and Spears v. Nesbitt, 197 La. 931, 2 So.2d 650. The facts of the cited cases render the opinions in those cases inappropriate here.

"In the Elson case, decided by Mr. Justice Hamiter as the organ of the Supreme Court, the facts were these: Mathewes, owning a 91 acre contiguous tract, sold one-half the minerals to Elson, thus creating a servitude on the 91 acres, and a few days thereafter, Elson sold one-half of his one-half mineral interest to Investors Royalty Co., Inc. Before the lapse of ten years, Mathewes leased his one-half mineral interest in the whole 91 acre tract to Arkansas-Louisiana Gas Co., and a year later Elson executed a similar lease, covering only 40 acres of the 91 acre tract to the same lessee. Thereafter, by means of a pooling and unitization agreement a drilling unit, comprising 640 acres, known as the Dowling Unit, was formed. The unit *did not include* the 51 acre tract (of the original 91 acre tract) but covered only the 40 acre tract which Elson had included in his lease. Production was obtained on the Unit (but no well was drilled on or production obtained from the 40 acres included in the Unit involved in the law suit, nor on any part of the 91 acre tract) and continued until July 1, 1946. The Court said [224 La. 417, 69 So.2d 735]:

" 'Because of this 10-year nonuse plaintiffs' mineral servitude would have prescribed in its entirety in 1947 had it not been for the pooling and unitization counterparts signed by the parties in 1944 (in effect a joint contract) which, among other things, stated: " * * * This agreement is executed with the specific purpose and intent on the part of each of the parties hereto to acknowledge the ownership of each and all of the parties hereto of their respective interest in and to the oil, gas distillate, condensate and other minerals and mineral rights *in the lands pooled herein,* so as to interrupt the running of the liberative prescription of nonuse, applicable under the laws of Louisiana to mineral servitudes, and each monthly payment of any of the royalties or other benefits hereunder, shall be considered and accepted by all parties as new acknowledgment made with the purpose and intent of interrupting said prescription as to all rights of all of the parties hereto under all the servitudes." As a result of such agreement, particularly the quoted provisions, it is certain that prescription as to that part of the servitude covering the 40 acres situated within the unit was interrupted in 1944.'

"It is quite obvious from the quoted part of the opinion why the Court held as it did, and its reasoning, manifestly correct, could not possibly apply to the cases here being considered.

"The Spears case, decided by then Associate Justice Fournet, now The Chief Justice, is equally without application here. In that case certain mineral interests were conventionally pooled, it being agreed that each was to receive royalties from production obtained anywhere on the pooled tract, in proportion to the ownership of each in the whole pool.

"Equally without merit is the contention that each time defendant leased a portion of the land covered by the servitude on the whole, it thereby created a separate servitude, covering only the leased acreage. The decision of the Supreme Court in Hunter [Co.] v. Ulrich, 200 La. 536, 8 So.2d 531, answers that proposition adversely to counsel's contention.

"From the foregoing, the court concludes, that:

"(1) A mineral servitude was established in favor of Long Bell Minerals Corporation, the predecessor in title of this defendant, on December 29, 1931, by the deed of that date, on all of the lands therein described, including the three tracts herein under consideration.

"(2) The drilling on and/or production from said lands has maintained that servitude until the time of the trial of these exceptions, as to all of the lands described in said deed that are contiguous to the lands upon which said wells were drilled and/or said production obtained, amongst which are the three tracts involved in these three law suits.

"(3) The exercise of the servitude as to the lands on which the drilling was done and/or the production obtained, constitutes possession of the servitude, as to all of the lands subject thereto, to the exclusion of those purchasing small tracts of said main body, especially in deeds containing reservation of mineral rights.

"(4) In order to maintain the jactitory action, plaintiff must be in possession of the property, the possession of which is sought to be vindicated.

"(5) Neither of the plaintiffs is in possession of the mineral rights in the tract described in his suit.

"In view of the foregoing, it is evident that defendant's exception of lack or want of possession must be maintained in each of these cases and plaintiff's suit dismissed at his cost. * * *."

For the reasons assigned, the judgment is affirmed at appellants' cost.

HAMITER, J., concurs in the decree.

FOURNET, C. J., absent.

On Application for Rehearing.

PER CURIAM.

In an application for a rehearing, counsel contend, among other things, that our holding in this case seriously affects the jurisprudence established in Spears v. Nesbitt, 197 La. 931, 2 So.2d 650; Ohio Oil Co. v. Ferguson, 213 La. 183, 34 So.2d 746 and Elson v. Mathewes, 224 La. 417, 69 So.2d 734.

■ Counsel are in error in this contention. We have merely held here, in line with International Paper Co. v. Louisiana Central Lumber Co., 202 La. 621, 12 So.2d 659, that a jactitory action may not be maintained as to mineral rights when there is outstanding of record a mineral servitude covering the land of which the plaintiff is in physical possession as owner, unless the servitude has prescribed because of nonuser. It appearing in this case that there has been a user of the original servitude, the jactitory suit must fail. However, this does not mean that our decision should be construed as holding that the contention raised by appellants relative to a reduction of the area of the servitude by the acts of the defendant may not be well founded. This question is open for determination in other litigation between the parties.

The application for a rehearing is refused.