425 So.2d 673 (1982)
SUCCESSION OF Ronald Bruce GOODE.
No. 81-C-1114.
Supreme Court of Louisiana.
March 26, 1982.
On Rehearing December 17, 1982.
Rehearing Denied February 11, 1983.
*675 Bennett L. Politz of Booth, Lockard, Politz & LeSage, Shreveport, for defendant-applicant.
John B. Hussey of Smitherman, Lunn, Hussey & Chastain, Truly W. McDaniel of Love, Rigby, Dehan, Love & McDaniel, Shreveport, for plaintiff-respondent.
LEMMON, Justice.
This case involves the validity of a testamentary disposition. The issue is whether the contested legacy constituted a prohibited substitution.
The testator died in 1978, leaving no ascendants or descendants and being survived by a half brother and the descendants of a predeceased half sister. He left an olographic will, which provided for several specific dispositions, but no residuary legacy. The contested legacy provided as follows:
"Fifth: All oil & gas royalty interest payments owned by me shall be paid to Pauline Egbert Parker for as long as she might live. After her death the amount of any payments shall be equally divided between my nieces and nephews and Linda Cosby Paine."[1]
After the will was probated, the opponents of the will filed a petition to annul the testament. The case was tried on stipulated facts, and the trial court held that the legacy was a prohibited substitution. The court of appeal affirmed. 395 So.2d 875.
We granted certiorari to review those holdings. 401 So.2d 359.
C.C. Art. 1520 prohibits substitutions generally as follows:
"Substitutions are and remain prohibited, except as permitted by the laws relating to trusts.
"Every disposition not in trust by which the donee, the heir, or legatee is charged to preserve for and to return a thing to a third person is null, even with regard to the donee, the instituted heir or the legatee."
As noted in the Report by the Louisiana State Law Institute to Accompany the Proposed Louisiana Trust Code[2], a prohibited substitution must contain (1) a double disposition in full ownership of the same thing to persons named to receive it, one after the other, (2) a charge to preserve and transmit the thing, imposed on the first beneficiary for the benefit of the second, and (3) the establishment of a successive order that causes the thing to leave the inheritance of the burdened beneficiary and to enter into the patrimony of the substituted beneficiary. See also Baten v. Taylor, 386 So.2d 333 (La.1979). Nevertheless, the disposition of a usufruct is not prohibited, nor is the disposition of successive usufructs. See C.C. Art. 1522 and 546.
In the present case the proponents of the will contend there was no express double disposition in full ownership and no express charge on the first beneficiary to preserve and transmit the property to a second beneficiary. They urge that we construe the testator's words as intending to separate his royalty interest in the property from the payments attributable to that interest, so that either (1) he intended to bequeath the payments to named beneficiaries by successive usufructs, while allowing the naked ownership of the royalty interest to pass by intestacy, or (2) he intended to bequeath a life usufruct to Pauline Parker and the naked ownership to the other named legatees.
*676 On the other hand, the opponents contend there were no words such as "use", "usufruct", "naked ownership", "enjoyment" or "use and benefit" indicative of the testator's intention to create the institutions of usufruct and naked ownership. Further citing the principle that a testator is presumed to have intended to dispose of all of his property, the opponents argue against construing the disposition as creating successive usufructs, while allowing the naked ownership to pass by intestacy.
When a landowner or servitude owner grants a mineral lease on property which is subject to a previously existing royalty interest and the lessee obtains production from the leased property, the royalty owner participates in the payments for minerals produced under the lease. See R.S. 31:80, codifying prior jurisprudence. But when the lease expires, the royalty interest remains in existence.
Although a layman, the testator (whose royalty income averaged more than $10,000 monthly) was undoubtedly aware of the difference between the royalty interest which he had acquired in one transaction and the payments he subsequently received, on account of that ownership, after the property was leased and production was obtained. Significantly, in drafting his will without benefit of counsel, he used the word "payments", and the deliberate use of that word suggests an intent to distinguish between the legal right he had originally acquired (royalty interest) and the income which subsequently flowed from that right. He could have left his royalty interest to Pauline Parker, thereby giving her both the right and the income currently flowing therefrom, but he chose to give her the royalty payments. While this disposition could reasonably be construed as a legacy of the royalty interest itself, it also could reasonably be construed as a legacy to Pauline Parker of the payments made on account of the royalty interest and a legacy to the other named legatees of the ownership of the royalty interest itself.[3]
In interpreting testaments, courts should principally seek to ascertain the intention of the testator, without departing from the proper signification of the testamentary terms. C.C. Art. 1712. Furthermore, when testamentary language is subject to two reasonable interpretations, courts should choose the interpretation which validates the will rather than the one which invalidates it, as long as that interpretation does not violate the testator's intent.
Here, the testator clearly intended for Pauline Parker to receive the payments made on account of his royalty interest in the property until her death and for the other named legatees to receive the payments thereafter in equal proportions. The law permitted him to accomplish this intention by giving the usufruct to one and the naked ownership to the others. While his uncounseled language did not expressly provide for the establishment of the legal institutions of usufruct and naked ownership, neither did the language expressly provide that both sets of legatees were to receive the royalty interest in full ownership or that the first legatee was to preserve it for the other legatees. This disposition can therefore be interpreted with equal reasonableness as the bequest of a life usufruct of the royalty interest to Pauline Parker and of the naked ownership to the other named legatees, and that interpretation accords completely with the testator's apparent intent, while making the testament valid. Accordingly, we interpret the testamentary disposition as establishing the enforceable legal institutions authorized by C.C. Art. 1522.
*677 In cases such as the present one, an appropriate solution is to give effect to the testamentary disposition by construing it as a valid usufruct-naked ownership legacy, rather than as a prohibited substitution, when the testator does not expressly outline all of the details of a prohibited substitution.[4] E. Nabors, An Analysis of the Substitution-Usufruct Problem under Articles 1520 and 1522 of the Louisiana Civil Code, 4 Tul.L.Rev. 603 (1930); A. Yiannopoulos, 3 Louisiana Civil Law Treatise-Personal Servitudes § 15 (2d ed. 1978). This interpretation achieves the laudable goal of validating testamentary dispositions, whenever the language may reasonably be construed so as to make the disposition valid and to achieve the testator's clear purpose, without frustrating the purpose of the prohibition against substitutions[5]. This interpretation also accords with Justice Dennis' suggestion in Baten v. Taylor, above, that pre-Trust Code jurisprudence concerning prohibited substitutions be reassessed in the light of the legislative amendments harmonizing substitutions with French doctrine and with the rule that penal and prohibitory laws should be strictly construed.
Accordingly, the judgments of the lower courts are reversed, and the petition to annul the probated testament is dismissed. Costs in all courts are assessed to the opponents.
DIXON, C.J., dissents with reasons.
CALOGERO, J., concurs and assigns reasons.
BLANCHE, J., dissents and hands down reasons therefor.
WATSON, J., dissents, assigning reasons and also adopts reasons assigned by BLANCHE, J.
CALOGERO, Justice, concurring.
The majority opinion is correct in finding that there is not here a prohibited substitution. Presented with the tough job of interpreting the will to ascertain the intent of the testator, the majority in my view comes up with the more reasonable conclusion when it finds that the testator wanted his wife's sister-in-law (Mrs. Pauline Egbert Parker) to have the royalty interest payments for the rest of her natural life with the seven other legatees (six nieces, nephews, and one Linda Cosby Paine) enjoying the mineral interest, in particular the payments following Mrs. Parker's death, and the mineral interest in its entirety. It is the preferable interpretation of the will that Mr. Goode did not intend that there be usufructs spanning successively the life of Mrs. Parker and the lives of seven variously aged younger people, with the naked ownership of the mineral interest property at the usufructs' terminations devolving upon his legal heirs. Incidentally those legal heirs are the six nieces and nephews and the testator's half brother, respondent James Philip Goode, who was named in the will as executor and as custodian of the family heirlooms.
As I see it, the testator, in effect, gave Pauline Egbert Parker a legacy of revenues from specified property, a "kind of usufruct", one which, under La.C.C. art. 609, "terminates, upon the death of the legatee *678 unless a shorter period has been expressly stipulated." Incidentally, La.C.C. art. 609 with its reference to a "kind of a usufruct" appears in § 5 of Chapter 2 of Title III (Personal Servitudes) a section relating to the termination of usufructs, not in the earlier sections (§ 1, § 2, § 3, § 4) of Chapter 2, Title III which govern the principles of usufruct and the rights and obligations of the usufructuary and the naked owner. As I interpret the codal articles there is no contemplation that the legacy of revenues, a "kind of usufruct", be governed by the articles relating to the obligations of a usufructuary of money and consumable things (La.C.C. art. 536 which appears in § 1 of Chapter 2 of Title III); neither is a return of the revenues at the end of the "kind of usufruct" contemplated. As noted in comment (d) under La.C.C. art. 609:
(d) Louisiana courts have declared that the intention of the legislature "was, not to make such bequests as the `annuities' usufructs in reality, for there is no transfer of possession to the usufructuary, but to make them quasi-usufructs, only for the purpose of limiting their duration." New Orleans v. Baltimore, 13 La.Ann. 162 (1858) (decided under the corresponding Article 602 of the 1825 Code). See also Succession of Ward, 110 La. 75, 34 So. 135 (1903). This correct interpretation that a legacy of revenues does not necessarily establish a real right of enjoyment in favor of the legatee was followed in Peyton v. Hammonds, 125 So.2d 491 (La.App. 2d Cir.1960).
For these reasons I concur.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
This legacy seems to be that contemplated by our new (1976) C.C. 609: "A legacy of revenues from specified property is a kind of usufruct..." Such a "kind of usufruct" is probably one of "consumable things ... such as money ..." (C.C. 536) for which the usufructuary must account at termination (C.C. 538). The first "kind of usufruct" terminates with the death of the first usufructuary, and then goes to nieces, nephews and Linda Paine. Since there is no residuary legatee, the naked owners of the royalty are the testator's heirs, who will probably consider the matter of security for the usufruct, which was not waived by the grantor. (C.C. 573).
BLANCHE, Justice (dissenting).
I respectfully dissent. The bequest containing the mineral interest created a double disposition in full ownership, as well as a charge to preserve and transmit.
The Mineral Code does permit the creation of a usufruct or a mineral right. R.S. 31:193. Thus, the payments generated by a mineral royalty may be distinguished from the interest that generates them. Therefore, Ronald Goode could have left the naked ownership of the mineral royalty to one and the payments it generated to another. The usufructuary, under such circumstances, would be entitled to all of the benefits of use and enjoyment that would have accrued to him if he were the owner of the right.
However, under the facts of this case, this writer is of the opinion that Ronald Goode intended to convey full ownership of the mineral royalty to the named legatees. Though C.C. art. 1713 requires a saving construction whenever possible, the language relied upon by the testator cannot be ignored. The language employed by Ronald Goode fails to support the conclusion that a usufruct was created. Absent are customary words such as "use", "usufruct", or "enjoyment", which suggest the existence of a usufruct. See Succession of Thilborger, 234 La. 810, 101 So.2d 678 (La.1958).
Further, the law presumes that when a will is executed, the testator intends to dispose of his entire estate. Carter v. Succession of Carter, 332 So.2d 439 (La.1976). The mineral royalty was Ronald Goode's major asset. He left no forced heirs and did not name a residuary legatee. These facts indicate that Goode, as a layman, intended to convey full ownership of the mineral royalty payments to Pauline Parker for her lifetime which, upon her death, would pass to the nieces, nephews and Linda *679 Paine. To place a saving construction on the bequest by concluding that usufructs were created, this Court has not only stretched, but actually departed from, the language used by the testator. Based on the facts of this case, our reasoning in Succession of Ledbetter, 147 La. 771, 85 So. 908 (1920), ought to be controlling:
"Article 1522 of the Code permits the giving of the usufruct property to one legatee and the naked ownership of the same property to another. But if every substitution, by which property is given to one legatee during his life and at his death to another, is to be regarded as vesting a life usufruct in the one and the naked ownership in the other legatee, Article 1520, which prohibits such substitutions, must have lost its meaning." (emphasis added)
Thus, if Ronald Goode was "undoubtedly aware" of the difference between the royalty and the payments that ownership generated, the surrounding facts and most reasonable construction of the language employed clearly reflect his total failure to express his knowledge of the legally permissible dismemberments of the right of ownership. Consequently, I find the bequest in dispute to contain a double disposition in full ownership.
Because the testator failed to create a usufruct in favor of the named legatees, any payments received by Ms. Parker during her lifetime are indistinguishable from the royalty that produces them. Consequently, the "payments" which are to be divided upon Ms. Parker's death are synonymous with the real right from which they are derived. Though there is no express charge placed upon Pauline Parker to preserve and transmit any payments she actually receives, future payments to the nieces, nephews and Linda Paine are dependent solely upon the preservation and transmission of the income producing interest. Thus, Ms. Parker is charged to preserve and transmit the royalty interest. Accordingly, the court of appeal was correct in its conclusion that the contested disposition constituted a prohibited substitution.
The strained interpretation of the contested bequest by the majority clearly hinders the objectives of C.C. art. 1520. The prohibition against substitutions prevents the testator from keeping property out of commerce and controlling the distribution of family wealth by altering the future order of succession. The bequest in dispute prevents the free alienation of the royalty interest and attempts to preserve the wealth generated by this real right. Though it is not likely that the existence and nature of mineral royalty interests were ever contemplated by the redactors of our Civil Code, the considerations which led to the prohibition against substitutions ought to apply with equal force to mineral interests.
WATSON, Justice, dissenting.
The will contains what is clearly a prohibited substitution. This conclusion is pointed up by the difficult and strained interpretation by which the majority attempts to find otherwise.
I respectfully dissent for these reasons and also for the reasons assigned by Justice Blanche.

ON REHEARING
DIXON, Chief Justice.
Ronald Bruce Goode died testate on April 30, 1978. Decedent left no descendants, no living ascendants, and no living spouse, though he was survived by a half brother and six nieces and nephews.
Decedent made a single page will, in olographic form, dated May 27, 1977 which made several specific dispositions, but named no residuary legatee. The will was admitted to probate and never challenged as to authenticity or as to form. However, the decedent's half brother, James Philip Goode, Sr., resigned as testamentary co-executor and filed a petition to annul the testament believing the following provision of the will was a prohibited substitution under C.C. 1520:
"Fifth: All oil & gas royalty interest payments owned by me shall be paid to *680 Pauline Egbert Parker for as long as she might live. After her death, the amount of any payments shall be equally divided between my nieces and nephews and Linda Cosby Paine."
The petition was answered and the case was tried on stipulated facts; the trial court found the bequest a prohibited substitution. The court of appeal affirmed. 395 So.2d 875 (La.App.1981). We granted certiorari to review those holdings. 401 So.2d 359 (La.1981).
On original hearing this court was divided on the validity of the will's provision, and those upholding the provision were divided on which rights of ownership devolved to the nieces, nephews and Linda Cosby Paine. We granted rehearing to reconsider these questions.
In the interpretation of a legacy, our first task is to determine the intention of the testator. C.C. 1720. The trial court in written reasons found that the testator had attempted to make a bequest to Mrs. Parker during her lifetime and upon her death a bequest to other named legatees. This was considered to be a classic example of a prohibited substitution. The court of appeal, in examining the words of the testator, noted the absence of the terms "use" or "use and benefit" which would have suggested that a usufruct had been created, and determined that the testator was bequeathing a royalty interest and not merely payments made on account of a royalty interest. The court of appeal, therefore, also found a prohibited substitution.
Within the context of the Civil Code, the creation of a usufruct divides the rights of ownership between two or more persons for a period of limited duration. C.C. 535. The usufructuary generally has the right to the use of the property and to the fruits which it may produce, while the naked owner alone has the right to alienate the property. C.C. 561 directs that the rights of the usufructuary and the naked owner in mines and quarries are governed by the Mineral Code. Upon termination of the usufruct, the rights of the usufructuary and the naked owner are reunited.
As the Civil Code directs use of the Mineral Code only for the respective rights of the usufructuary and the naked owner, and not for the establishment or termination of a usufruct, the question of whether a usufruct has been created and when it will end must be determined under the Civil Code and relevant jurisprudence. However, our application of the Civil Code is clearer after examining the applicable provisions of the Mineral Code, R.S. Title 31.
Much of the difficulty in this case arises from the nature of the underlying asset (the mineral right) and the future payments which it generates (the royalty payments), and whether the two may be considered separately or are so united that they may not be distinguished. The opponents of the validity of the will's provision contend that the royalty payments are compensation for minerals removed from the ground; that the payments are only generated by the depletion of the asset. Under this reasoning, the payments are not fruits, but are compensation for the consumption of the asset itself. Under the Civil Code, a usufructuary is entitled only to the fruits. C.C. 550.
The Mineral Code does not divide the rights of the usufructuary and the naked owner consistently with the Civil Code concept of fruits. R.S. 31:16 describes the three basic mineral rights as the mineral servitude, the mineral royalty and the mineral lease. Mineral Code provisions concerning mineral rights are equally applicable to all three basic types of mineral rights. R.S. 31:80 defines a mineral royalty as the right to participate in the production of minerals from either land or a servitude owned by another; however, the owner of a royalty has no "executive rights," nor any rights to explore for or produce minerals. R.S. 31:81. Any benefit thus accruing to a royalty owner is contingent on the successful efforts of others.
A mineral royalty may clearly be the subject of a usufruct. In such a case, R.S. 31:193 provides:

*681 "One who has the usufruct of a mineral right, as distinguished from the usufruct of land, is entitled to all of the benefits of use and enjoyment that would accrue to him if he were the owner of the right. He may, therefore, use the right according to its nature for the duration of his usufruct."
While the comments to this article indicate that common sense requires the usufructuary have the rights of the owner to prevent the right from becoming lost, a royalty owner, and consequently the usufructuary of a royalty right, is prohibited by R.S. 31:81 from taking any direct action leading to the preservation of his right. This provision, applicable to mineral royalties, has the effect of merging into the usufructuary all of the rights of use and enjoyment of the naked owner.
With the exercise of the rights of use and enjoyment by the usufructuary, the minerals subject to the right become depleted, but the right itself is not diminished. The right to share in production remains. The usufruct of a mineral royalty is a usufruct of a nonconsumable though its value is dependent on a consumable resourcea resource which may be completely consumed during the term of the usufruct. But the attributes of ownership of the royalty right have been divided, and the naked owner stands ready to receive full ownership upon termination of the usufruct. The division of attributes of ownership of the royalty right is further clouded by the lack of rights and duties incumbent on a mineral royalty owner. Where there is a usufruct of a mineral royalty, the only readily apparent right is to receive royalty payments if and when production exists, with no corresponding duties.
Since there is so slight a difference between a full owner and a usufructuary of a mineral royalty, whether full ownership has been transferred or only a usufruct has been created is difficult to determine from analyzing the end result of any act of transfer or bequest. The language used in the transfer may be important in determining the intent.
The testator chose the word "payments" when describing the subject of his bequest. He did not choose the words "use" or "use and benefit" which would have clearly shown an intention to confer a usufruct on the named legatees. This is not, however, fatal to the validity of the bequest as a usufruct. What is required is a manifestation of the will of the testator to confer less than full ownership to the legatee. In bequeathing the "payments" rather than the "royalty interest," the testator fully described the benefits that would flow to a usufructuary of a mineral royalty. Since the case was submitted to the trial court on stipulated facts, there was no record developed below which would indicate the existence of any expertise of the decedent in the area of mineral rights. The stipulated facts are silent on the matter, but the death certificate filed into the record indicates the decedent was a retired independent oil operator. C.C. 1713, requiring a court to give a saving construction to a will whenever possible, encourages us to believe the testator understood the difference between a royalty payment and a royalty interest, and deliberately donated the payments and not the interest.
The testator again used the word "payments" when describing his bequest to the nieces, nephews and Linda Cosby Paine, who were to receive the payments, if any, upon the death of Mrs. Parker. Because of the identity of the language used, we find the same intent on the part of the testator, that is, to grant a usufruct of the mineral royalty to this second set of legatees. Successive usufructs are expressly provided for in the Civil Code in article 546. To hold otherwise strains the clear meaning of the words chosen by the testator. See C.C. 1712.
Finding successive usufructs in this will, where there is no mention by the testator of the disposition of the naked ownership and no residuary legatee, the naked ownership falls intestate. Under these circumstances, this is not an inconceivable result. At oral argument on the rehearing of this case, opponents of the validity of the will's fifth *682 provision suggested that both at the time the will was written and at the time of death of the testator, the payments being received by the testator were around $300 per month and the royalty was not the substantial asset that it later became. It is not unreasonable that the testator did not make a specific bequest of a residual right in a depleting asset that may not have been anticipated to have any value at the death of his last niece or nephew many years later.[1] In any event, the slight prospect that the right would still have been valuable at a distant point in the future is not a sufficient basis for a present construction of the will that would completely ignore the testator's expressed intention to bequeath the payments to the named legatees.
Further, the lack of a termination point of the rights of the second set of legatees is not determinative of the kind of legacy they received under the will. C.C. 609 provides that:
"A legacy of revenues from specified property is a kind of usufruct and terminates upon death of the legatee unless a shorter period has been expressly stipulated."
This article, read in conjunction with C.C. 547 providing that where there are several usufructuaries the termination of the interest of one usufructuary inures to the benefit of those remaining, fixes the termination of the usufruct granted to the second set of legatees at the death of the last remaining legatee, at which point the usufruct and the naked ownership will be reunited into full ownership, whether or not there is any value remaining in either.
For the foregoing reasons, we hold that the fifth provision of the will of Ronald Bruce Goode creates successive usufructs[2] in favor of Pauline Egbert Parker, and, upon her death, in favor of the testator's nieces, nephews and Linda Cosby Paine. The naked ownership of the mineral royalty devolves to the intestate heirs.
The judgments of the lower courts are reversed, and the petition to annul the probated testament is dismissed, all at the cost of respondent, James Philip Goode, Sr.
CALOGERO, J., concurs in part, dissents in part and assigns reasons.
DENNIS, J., concurs.
BLANCHE, J., dissents for reasons previously assigned.
WATONS, J., dissents.
CALOGERO, Justice, concurring in part, dissenting in part.
I concur in the majority's finding no prohibited substitution, but disagree with the *683 majority's conclusion that the naked ownership of the mineral royalty devolves in time, upon the testator's legal heirs. My reasons are more fully and ably expressed in the majority's original opinion and my concurrence thereto.
NOTES
[1] Neither of the named legatees were heirs of the testator. There were six nieces and nephews.
[2] See Vol. 3A, LSA-R.S., p. XXXIX (1965).
[3] The word "payments" is also used in the disposition to Linda Paine and the nieces and nephews, which arguably weighs in favor of a finding of successive usufructs, once the court determines that the testator intended to distinguish between royalty interest and payments. However, the separate gifts of a usufruct and the naked ownership are probably closer to the uncounseled testator's actual intention, and we place significance on the use of the word "payments" primarily to demonstrate the testator's intent to distinguish between royalty interest and payments, rather than to determine which gift was intended for each legatee.
[4] The author of this opinion points out that even if the testator intended the legacy as a disposition of the royalty interest in full ownership to both sets of legatees, Pauline Parker was not charged with the obligation to preserve the property and to return it to a third person, which is one of the essential elements of a prohibited substitution as defined by C.C. Art. 1520. In the author's view, a disposition by which a legatee is given full ownership of property for his life and charged to transmit the residue of the property at his death is a valid substitution which is not prohibited by C.C. Art. 1520, because it does not contain the essential charge to preserve and render. J. Tucker, Substitutions, Fideicommissa and Trusts in Louisiana Law: A Semantical Reappraisal, 24 La.L.Rev. 439, 489; A. Yiannopoulos, above; Succession of Walters, 261 La. 59, 259 So.2d 12 (1972), Barham, J., Concurring; Crichton v. Succession of Gredler, 256 La. 156, 235 So.2d 411 (1970), Sanders, J., Dissenting.
[5] The purpose of the prohibition is to prevent attempts to tie up property in perpetuity. However, C.C. Art. 1482 accomplishes that objective by limiting capacity to receive gifts to persons conceived at the time of the donation or the death of the testator.
[1] That the testator may have believed that the payments would diminish over time may be inferred from the language of the bequest. With regard to Pauline Parker, the first usufructuary, the language used was: "All ... payments owned by me shall be paid ..." while the second set of legatees was to divide: "... the amount of any payments..." (Emphasis added).
[2] The matter of security for the usufruct, though not before the court in this case, was mentioned in preceding dissenting and concurring opinions. Whether the payments bequeathed are considered legacies of revenues under C.C. 609 or as usufructs with the rights and obligations of the usufructuary and naked owner controlled by the provisions of the Mineral Code, there is probably no obligation on the legatees for either security or an accounting. Comment (d) to article 609 states that the legacies of revenues are only a "kind of usufruct" that does not transfer possession to the legatee but only a personal non-heritable right to receive the revenues. Such a bequest is considered a quasi-usufruct only for the purpose of limiting their duration, and as such these quasi-usufructs are not burdened with the obligations of a usufructuary. However, there appears to be no prohibition to the creation of a usufruct over revenues that would require both security and an accounting. Specifically relating to usufructs involving minerals, C.C. 561 provides that the rights of the usufructuary and of the naked owner are governed by the Mineral Code. Comment (a) makes it clear that the article is intended to apply to both their respective rights and obligations. Within the Mineral Code, R.S. 31:194, amended by 1975 La. Acts No. 589, § 2, expressly provides: "... a usufructuary of a mineral right is not obligated to account to the naked owner of the ... mineral right for the production or the value thereof or any other income to which he [usufructuary] is entitled."