8 So.2d 531

HUNTER CO., Inc., v. ULRICH.

No. 36464.

April 27, 1942.

Rehearing Denied May 25, 1942.

Robert R. Stone, of Lake Charles, and Wilkinson, Lewis & Wilkinson, of Shreveport, for appellant.

Liskow & Lewis, of Lake Charles, for appellee.

ROGERS, Justice.

The Hunter Company, Inc., asserting that it was the owner of and in possession of certain tracts of land described in its petition, brought this suit against Bernhard Ulrich, alleging that Ulrich was slandering its title by claiming to be the owner of certain mineral rights in the property. Plaintiff alleges that the mineral rights claimed by defendant were extinguished by the prescription of ten years liberandi causa, which plaintiff expressly pleaded. Plaintiff alleges in the alternative that should it be held that the running of the prescription had been interrupted by the drilling of a well on the property, the interruption did not apply to those portions of the property which are separated from the portion on which the well was drilled by certain strips of land belonging to the Houston River Canal Company, Limited.

Defendant, in its answer, admitted plaintiff's ownership of the tracts of land described in the petition subject, however, to defendant's mineral rights therein.

After hearing the parties, the court below rendered judgment rejecting plaintiff's demands and decreeing defendant to be the owner of the mineral rights in dispute. Plaintiff appealed from the judgment.

These are the material facts. On October 6, 1920, the Louisiana Exploration Company conveyed by warranty deed to S. S. Hunter, plaintiff's author in title, certain lands situated in the Parish of Calcasieu in Sections 17, 18, and 19, Township 9 South, Range 10 West, and Section 13, Township 9 South, Range 11 West. In the deed to Hunter, the Louisiana Exploration Company expressly reserved from the sale the mineral rights in the lands conveyed and also stipulated that the conveyance was made subject to the rights of the Houston River Canal Company, Limited, in certain strips of land which are described in the deed. The mineral rights reserved in the sale from the Louisiana Exploration Company to Hunter were

subsequently acquired by Bernhard Ulrich. On February 11, 1928, Frank J. Carroll, who was then the record owner of the mineral rights now belonging to the defendant, executed a mineral lease in favor of the Kelso Petroleum Corporation covering a portion of the lands involved herein, which lands are described as Section 19, Township 9 South, Range 10 West. On July 12, 1928, the Kelso Petroleum Corporation assigned the mineral lease to J. W. Watson so far as it affected the south half of Section 19. Under this lease J. W. Watson, some time during the latter part of the year 1928 and the first part of the year 1929, carried on drilling operations in the southeast quarter of Section 19. These operations were carried on until the well was drilled to the depth of 5,340 feet, at which depth it was abandoned as a dry hole.

The plaintiff's position is that the Watson well was not drilled in good faith and therefore did not interrupt the running of prescription. Defendant takes the contrary position. During the course of the trial it was stipulated by counsel representing the parties that subsequent drilling operations on the land were sufficient to interrupt the running of prescription if it should be held that the drilling of the Watson well was sufficient for that purpose. The stipulation was entered into without prejudice to plaintiff's alternative claim that certain canals running through the property separated the property into noncontiguous tracts and the drilling of a well on one tract was not sufficient to interrupt the running of prescription on the other tracts.

The first question presented for decision is whether the drilling of the dry hole, known as the Watson well, in the southeast corner of Section 19, Township 9 South, Range 10 West, constituted a serious attempt to discover oil with the view of using or exercising the mineral servitude claimed by defendant. Plaintiff contends that it was not because, first, there was no reasonable hope of discovering minerals in the well at or above the depth to which it was drilled, and, secondly, that the well was simply a scheme organized by Watson to promote the sale of stock.

In Keebler v. Seubert, 167 La. 901, 120 So. 591, 592, the rule was announced that the drilling of a nonproducing well, in good faith, is sufficient to interrupt the running of ten years' prescription liberandi causa against a mineral servitude. This is so because, as was said in that case: "The right to the continued use of the servitude retained is not dependent upon the successful outcome of the exploiting, * * *."

The rule announced in the Keebler case was adhered to in Lynn v. Harrington, 193 La. 877, 192 So. 517, and Ohio Oil Co. v. Cox, 196 La. 193, 198 So. 902.

In Louisiana Petroleum Company v. Broussard, 172 La. 613, 135 So. 1, this Court further defined the rule to mean that the well must be drilled to a depth at which there is some reasonable hope of discovering minerals in paying quantities.

Therefore, the sole question presented for decision is whether the facts developed on the trial bring the case within the rule

announced in the cases to which we have referred.

▆ The trial judge, in his written reasons for judgment, found that the testimony amply supported the claim of the defendant that the Watson well was drilled in good faith and to a depth at which there was a reasonable hope, or expectation of producing minerals in paying quantities. On that phase of the case, the trial judge had this to say:

"The facts as shown by the record in connection with the actual drilling operations on the Watson Well are substantially as follows: The well was located almost directly in the Southeast corner of Section 19. It was commenced on August 11, 1928 and operations were continued until April 8, 1929, or for a period of about eight months. The well was drilled to a total depth of 5,340 feet. Ten-inch casing was set to a depth of 870 feet and then 5⅝ inch casing was set to a depth of 4,-014 feet. The record shows that the operators took 220 cores of the well from a depth of 3,300 feet to the bottom of the hole. Cores, it appears, were taken for the purpose of determining the character of the various formations penetrated by the drill. There was carefully made and kept a complete log of this well and a copy of which was filed with the Department of Conservation. The record further shows that the operations on this well actually cost the sum of $48,000.00 for labor, pipe, fuel, etc., all of which went into the cost of these drilling operations. The record further shows that in addition to the above mentioned cost, the lease itself, under which these operations were conducted, cost the operators in cash $6,400.00. It may be noted further, that in the original lease from Frank J. Carroll, the then owner of the mineral lease rights, to the Kelso Petroleum Corporation, and under which lease these operations were conducted, it was agreed that unless oil and gas shall be found in paying quantities at a lesser depth, the lessee will drill each well to a depth of not less than 4,500 feet.

"The record shows that the Watson Well was located to the West and slightly North of the Sulphur Mine Oil Field, and was at the time the well was abandoned in the early part of 1929 some 1,200 feet from the closest producing well. The Sulphur Mine Field is a salt dome field and at the present time the dome is practically surrounded by producing wells. It appears that oil was first discovered about this dome in the latter part of 1925 or in the early part of 1926, and the first oil well brought in on the West side of the dome during the year 1926. Drilling operations around this dome, as in most of the fields in this Gulf Coast area, have shown that while the formations and conditions surrounding the domes are not uniform, yet in a general way production is found at shallower depths close into the dome, and the further away from the dome one drills the deeper he must drill to reach production. Operations have shown, however, in several cases a well located further away from the dome has production at a shallower depth than some other wells nearer in to the dome. So that one can not tell, and could not tell, especially under condi-

tions existing in the year 1928, with any degree of exactitude without actually drilling just where production would be found.

"Apparently the contention of the plaintiff is based almost entirely on the fact that a well designated as well number 728 located on the Westerly side of the dome and just within the outline or rim of the dome was drilled to a depth of 6,081 feet and abandoned as a dry hole on September 21, 1928. This well was located a few hundred feet in a Westerly direction from a well designated as Well Number 737 which was brought in as a producer in January of 1929 at a depth of 3,175 feet, and was slightly between the Watson Well and the said producing well Number 737, and was some 1,200 feet nearer the dome than was the Watson Well. Hence the plaintiff contends that under these conditions no reasonable hope could have been entertained for finding production in the Watson Well until a depth greater than 6,081 feet had been reached and hence this being true the operation was not sufficient to interrupt the current of prescription.

"While it is true that Well Number 728 was drilled to a depth of 6,081 feet and was located considerably nearer the dome than the Watson Well, yet as shown by the evidence the formation and conditions surrounding this dome are not uniform. The record shows that Well Number 723 was brought in as a producer in April of 1928 at a depth of 3,279 feet. This well is located some little distance further from the outline of the dome than is Well Number 728, which was abandoned as a

dry hole at a depth of 6,081 feet, but not as far distant as the Watson Well from the dome. Well Number 725 was brought in as a producer in June of 1928 at a depth of 3,429 feet. This well is located some distance further from the dome than well Number 728, but not as far distant as the Watson Well. Likewise Well Number 731 was brought in as a producer in December of 1928 at a depth of 4,349 feet. This well is located considerably further from the dome than Well Number 728 and is almost ae far distant from the dome as is the Watson Well.

"There is considerable expert evidence in the record to the effect that Well Number 728 could not have been drilled vertically, and that the hole veered away from the dome, and in view of the fact that other wells in the immediate vicinity were brought in as producers at a much lesser depth, this Court is inclined to the belief that the depth of 6,081 feet to which this well was drilled did not represent a vertical depth.

"The plaintiff contends in the second place that the drilling of the Watson Well was not a bona fide attempt to produce oil, because it was simply a promotional scheme on the part of J. W. Watson to make some money out of the drilling of this well without any real hope of obtaining production. There was some evidence to this effect, especially as found in the testimony of Hap Avery, a witness for the plaintiff, and who was the Manager of the Watson operations. This testimony was based, however, largely on the personal

opinions and conclusions of the witness himself.

"This Court after a careful review of the record, and considering the fact that these drilling operations on the Watson Well were conducted at a time when the formations surrounding this dome and when the outlines of the dome itself were not known with any great degree of certainty, and considering the fact that several producing wells had been brought in on the Westerly side of the dome within a distance of 1,200 feet and at depths ranging from 3,200 feet to 4,500 feet, and considering the fact that the operators spent $48,000.00 in cash as actual cost of these operations, and an additional sum of $6,-400.00 for the lease itself, and considering the fact that a period of eight months were spent by the operators in these operations, and considering further the apparent care of the operators in taking cores of the well, 220 in number, and the carefully kept log of the formations encountered, all indicate to this Court that the operations were serious and that under conditions at that time the operators did carry on these operations to a depth at which there was a reasonable hope of finding production."

The findings of fact by the trial judge are supported by the testimony in the record and warrant his conclusion that the drilling of the Watson well interrupted the running of the prescription of ten years liberandi causa. This being true, then, in accordance with the stipulation of counsel appearing in the record, as to subsequent interruptions, the mineral rights owned by

defendant are in effect as to the portion of land upon which the well was located. The question of whether those rights are also in effect on the remainder of the property brings up for consideration the second question presented for decision.

It is plaintiff's contention that certain canals located on the lands involved in this suit separate the lands into noncontiguous tracts and that the drilling of the Watson well on one of the tracts did not interrupt the running of prescription as to the other noncontiguous tracts. The law is well settled that any reservation or grant of mineral rights with respect to several noncontiguous tracts creates a separate and distinct mineral servitude as to each tract. From which it follows that the use or exercise of a servitude on one of the tracts will not serve to preserve the servitude as to the other and distinct tracts. Lee v. Giauque, 154 La. 491, 97 So. 669; Arent v. Hunter, 171 La. 1059, 133 So. 157; Calhoun v. Ardis, 174 La. 420, 141 So. 15.

The question therefore is one of fact to determine whether, by the deed dated September 10, 1900, the Houston Canal Company, Limited, acquired from S. S. Hunter the strips of land described in the deed in fee, or merely a right of way thereon.

The record discloses that the original deed apparently is not in existence and that the book in which the deed was recorded in the clerk's office was lost in a fire which, on April 23, 1910, destroyed the Calcasieu Parish courthouse in the City of Lake Charles. The only evidence of the transfer offered by plaintiff was the cer-

tificate issued by the Mayo Title Guaranty Inc. This certificate does not purport to be a complete copy of the instrument as originally made and recorded, but only of an excerpt or a "take off" from the records of the clerk's office. The certificate refers to the instrument as a warranty deed, and also describes the property conveyed as "a strip of land 150 feet wide," etc.

S. A. Mayo, who is the secretary and treasurer of the Mayo Title Company and who has been actively engaged in abstract work with the company for more than thirty-five years, in explaining the method used in compiling its records, testified that it was impossible to say with any degree of certainty whether the instrument referred to in the particular excerpt or take off was an instrument conveying a fee or an instrument conveying merely a right of way. Mr. Mayo stated that in the year 1901 it was not the custom of the abstracters of the company, in preparing these take offs, to make an extensive search of the instruments; that the instrument referred to in the certificate might have contained some other clauses which were not shown in the take off. Mr. Mayo further testified that from his examination of the excerpt or take off, and in view of the method used by the Title Company in those years, the instrument itself might have been a warranty deed conveying a right of way, or it might have been a warranty deed conveying a fee title to a strip of land.

A circumstance indicating that the conveyance was merely one of a right of way rather than of a fee title is the consideration for the transfer which, as shown in the abstracter's take off, was "$10.00 and other valuable considerations." Apparently the only money paid for the rights conveyed was $10 which was wholly out of proportion to the value of the fee to so large a quantity of land as was described in the deed. The other valuable considerations to which reference is made were to result probably from the digging of the canal. This, in itself, would indicate that the transfer was made for canal purposes only. Other transfers in the chain of title support defendant's contention that only a right of way was conveyed to the canal company. The deed in which the mineral rights were reserved and which conveyed the land to S. S. Hunter in 1920 recites that the "said premises are also conveyed subject to the following." This statement is followed in paragraph one by a reference to certain rights conveyed to the Union Sulphur Company which have no connection with this suit. However, in paragraph two this declaration appears: "The rights of the Houston River Canal Company, Limited, acquired by warranty deed dated September 10, 1900, filed for record September 15, 1900, and recorded in Book of Conveyances Number 29, at page 592, executed by Samuel S. Hunter to the Houston River Canal Company, Limited, in and to" the various strips of land in dispute.

The analysis of this instrument by the trial judge is set forth in his written reasons for judgment as follows:

"This instrument, therefore, as this Court interprets it, conveys the lands therein described 'subject to' 'the rights' of the

Houston River Canal Company 'in and to the strips of land' acquired by it by virtue of the said deed dated September 10, 1900. It would appear, therefore, to this Court, that this conveyance was made subject to the rights of the Houston River Canal Company in and to the described strips of land, and that the deed did not except or reserve from the sale the strips of land themselves.

"It further appears that the, vendee in this deed is the same person named as the vendor in the deed to the Houston River Canal Company dated September 10, 1900, and it would appear to this Court that it may be reasonably supposed that he knew what had been conveyed to the Houston River Canal Company in that deed dated September 10, 1900, and that it was his understanding that the deed from the Louisiana Exploration Company to him on October 6, 1920 was made simply subject to those rights acquired by the Houston River Canal Company by that deed dated September 10, 1900.

"It is further noted that the language used in this deed is almost identical with the language used in the deed by which the Louisiana Exploration Company acquired these lands from S. S. Hunter under date of January 25, 1917, and which lands were reacquired by the said S. S. Hunter from Louisiana Exploration Company by the said deed dated October 6, 1920."

When S. S. Hunter sold the lands to the Louisiana Exploration Company on January 25, 1917, he did not except from the sale the strips of land in question. He conveyed the property in its entirety subject,

however, to a number of exceptions, among which were, first, the rights of the Union Sulphur Company, and, secondly, the rights of the Houston River Canal Company under its deed in and to certain strips of land, which were described in detail. When Hunter re-acquired the property from the Louisiana Exploration Company on October 6, 1920, his acquisition according to the terms of the deed were subject to the rights of the Houston River Canal Company, not less or except the strips of land themselves.

It is certain that Hunter knew what the Houston River Canal Company owned at the time of his transactions with the Louisiana Exploration Company. This being true, it is not rational to believe that if the Houston River Canal Company owned the fee of the strips of lands themselves and not merely certain rights therein, the deeds from Hunter to the Louisiana Exploration Company, and from that company to Hunter, would have merely conveyed and reconveyed the lands described therein, subject to the rights of the canal company in and to the strips and not the lands less or except the strips themselves. If a person owns a parcel or strip of land, he owns it in its entirety and not merely a right in and to the property.

Another circumstance that indicates the sale from Hunter to the Houston River Canal Company embraced only a right of way and not a fee title is that for many years, after the execution of the deed, the canal company did not pay any taxes on the strips of land referred to in the instrument. According to the testimony of one

of plaintiff's witnesses who examined the assessment rolls of Calcasieu Parish in the year 1910 to the year 1920, the canal company was not assessed in any of the sections in which its canals running through these particular strips are located. The company, however, was assessed as the owner of fourteen miles of canals running through other sections in Township 9 South, Range 10 West. The same witness testified that during the years 1910 to 1920, which was the period covered by her examination, the entire property, without excepting these particular strips, was assessed to S. S. Hunter, the vendor and the vendee of the Louisiana Exploration Company.

It also may be observed that it was not necessary for the Houston River Canal Company to acquire the strips of land in fee, since the acquisition of a right of way thereon was all that was necessary for its purpose.

We have concluded, as did the district judge, that the deed executed by S. S. Hunter on September 10, 1900, to the Houston River Canal Company, Limited, did not convey a fee title to the strips of land described in the deed, but only to a right of way or to the use of the property for canal purposes. Therefore, the lands described in plaintiff's petition are contiguous and plaintiff's alternative demand must also fall.

The parties reciprocally claim that the burden of proof is on the adverse party. The question as to which party bears the burden of proof is not of controlling importance. On the issues raised by the pleadings, the evidence as a whole preponder-

ates in favor of the defendant and justifies the judgment of the court below.

For the reasons assigned, the judgment appealed from is affirmed.