578 So.2d 977 (1991)
John Leroy HORTON, et al., Plaintiffs-Appellants,
v.
O.B. MOBLEY, Jr., et al., Defendants-Appellees.
No. 22105-CA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 1991.
Rehearings Denied May 2, 1991.
Writ Denied June 28, 1991.
*979 Frederic L. Miller, Francis M. Gowen, Jr., Shreveport, for Horton appellants.
Stinson & Stinson by Ford E. Stinson, Jr., Benton, for Stinson appellants.
Comegys, Lawrence, Jones, Odom & Spruiell by William Paul Lawrence, II, for Stinson appellants.
Blanchard, Walker, O'Quin & Roberts by Robert Roberts, III, J. David Garrett, Shreveport, for Hodges/Elm Grove appellee.
Before NORRIS, HIGHTOWER and VICTORY, JJ.
VICTORY, Judge.
In this petitory action, plaintiffs appeal a partial summary judgment in defendants' favor declaring their mineral servitude(s) on 556 acres of land extinguished by ten years prescription for nonuse as of May 23, 1954, ordering them to furnish defendants with recordable evidence reflecting the lapse of their mineral interests and to account for all mineral production proceeds they received commencing with the date of first production from specified unit wells on an included 123-acre tract.
Claiming, inter alia, that continued production from a pre-existing well reserved by their ancestor in title is sufficient to interrupt prescription on their mineral servitude, *980 plaintiffs contend the partial summary judgment was improvidently granted.
We affirm.

I.

FACTS
This case involves numerous parties. Plaintiffs are two groups with common interests as either the heirs or successors in title of A.L. Horton (Horton). Defendants are the heirs and successors in title of W.H. Hodges, Jr. (Hodges) and their mineral lessees.[1]

A. PRIOR LAND AND MINERAL TRANSFERS.
The facts concerning the relevant title and mineral transfers are not disputed. On December 1, 1925 the Estate of S.S. Hunter, Inc. (Hunter) sold to Horton and Hodges a 565-acre tract of land located in Bossier Parish.[2] In this conveyance, Hunter retained certain mineral rights under a reservation clause which we here edit and reproduce:
three-fourths (¾) of all of the minerals in and under the property, which [Hunter] specifically reserves, and [he] likewise retains all oil and gas wells on the property, consisting now of two (2) oil and two (2) gas wells owned by The Palmer Corporation and two (2) oil and two (2) gas wells owned by [Hunter] and one (1) gas well owned by the Gulf Refining Company of Louisiana, the production... and all income from which is retained by [Hunter]. (brackets added.)
Hodges died in 1943. On May 23, 1944, the Hodges heirs and Horton voluntarily partitioned the land and mineral interests they acquired from Hunter. In the partition, the Hodges heirs received approximately 556 acres (the Hodges property) and Horton received the remaining nine acres. Additionally, each party expressly and separately reserved "all of the mineral rights in the [other's property] ... which they owned prior to the execution of this transfer."
It is the characterization and nature of the mineral rights reserved by Hunter in 1925 and those reserved by Horton in 1944 and the continued viability of Horton's mineral rights that are at issue in this appeal.

B. PROCEDURAL HISTORY.
Claiming they were entitled to be recognized as owners of an undivided one-eighth mineral interest in, and to be paid their pro rata production proceeds from, specified producing unit wells drilled or recompleted in the 1970s or 1980s and located on the Hodges property, plaintiffs filed suit on September 23, 1983. Plaintiffs alleged that O.B. Mobley, Jr. (Mobley), who was the operator and producer of the producing unit wells and initially the sole defendant, had refused to recognize their mineral interests.[3]
*981 After preliminary matters were addressed,[4] defendants answered the petition, denying plaintiffs had a viable mineral claim and specifically alleging that plaintiffs' mineral interests had prescribed. Additionally, reconvening via a possessory action, defendants sought a judgment declaring plaintiffs' mineral interests had been extinguished effective May 23, 1954, by ten years prescription of nonuse and that the Hodges heirs, as landowners, became the owners in 1954 of the mineral rights which in 1954 of the mineral rights which plaintiffs claimed. Defendants further sought an order pursuant to Louisiana Mineral Code Art. 206 A, LSA-R.S. 31:206 A, (hereinafter cited as Mineral Code), requiring plaintiffs to execute all documents necessary to reflect in the public records the termination of their mineral interests.[5]
Following discovery, defendants moved for partial summary judgment on the prescription issue. Having lost in the trial court, plaintiffs now appeal and, for the first time, seriously contend that material issues of fact exist. However, they primarily argue the trial court erred in failing to find that production from a well Hunter reserved in 1925 (designated as Hunter Well No. 1) and in which he held a 100 percent interest served not only to interrupt prescription as to Hunter's mineral interests, but also those of the plaintiffs. They further argue that in granting the partial summary judgment the trial court erroneously accepted a disputed factual interpretation concerning the Hunter reservation clause.

II.

NON-RECORD EVIDENCE ON APPEAL
After appealing, one plaintiff group filed here an "Alternative Motion to Remand," claiming newly-discovered evidence, which was attached to and discussed in their brief, would affect the outcome of this case. Defendants then filed a responsive motion requesting this court to disregard the non-record material plaintiffs submitted since such was not introduced in evidence in the trial court and is outside the record on appeal. Citing C.C.P. Art. 2164, we denied both motions, noting this court disregards any non-record material and renders judgments which are just, legal and proper based "only upon the record on appeal."[6]
We now reiterate the better method to alert the court that non-record material is the basis of an argument is simply to call that fact to our attention either by a statement in the appellate brief or during oral argument. See Sutton v. Montegut, 544 So.2d 1181, 1184 (La.App. 5th Cir.1989); Welborn v. Ashy Enterprises, Inc., 504 So.2d 120, 122 (La.App. 2d Cir.1987); Jackson v. Walmart Properties, Inc., 443 So.2d 3 (La.App. 3d Cir.1983).

III.

SUMMARY JUDGMENT
The granting of a motion for summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the mover is entitled to judgment as a matter of law. C.C.P. Art. 966B. The burden of proof is upon the movant, who must affirmatively establish the absence of a genuine issue of material fact and entitlement to judgment.
*982 A fact is material if its existence or nonexistence may be essential to the movant's cause of action under the applicable theory of recovery. In other words, facts are material if they potentially insure or preclude recovery, affect the litigants' ultimate success or determine the outcome of a legal dispute. Ouachita Nat. Bank v. Palowsky, 570 So.2d 114 (La.App. 2d Cir. 1990); Liem v. Austin Power, Inc., 569 So.2d 601 (La.App. 2d Cir.1990).
If the moving party comes forward with facts that would resolve all genuine issues of material fact, then the burden shifts to the opposing party to present evidence showing material facts are still at issue. Dement v. Red River Valley Bank, 506 So.2d 1329 (La.App. 2d Cir.1987). In such event, a summary judgment opponent may not rest on mere formal allegations or pro forma denials without substance. The opponent must set forth specific facts in affidavits or otherwise showing there is a genuine issue for trial. C.C.P. Art. 967; Liem v. Austin Power, Inc. and Ouachita Nat. Bank v. Palowsky, both supra, and cases therein cited.
Summary judgment as a matter of law will be granted only if the disputed issues of fact present no genuine issues. Only when reasonable minds must inevitably concur is a summary judgment warranted. Any doubt should be resolved in favor of a trial on the merits. See Liem v. Austin Power, Inc. and Ouachita Nat. Bank v. Palowsky, both supra, and cases therein cited.

IV.
In light of the above principles and the record, we address the issues raised. Claiming the 1925 Hunter mineral reservation clause is "inartfully drawn" and "ambiguous," plaintiffs first contend that in rendering the summary judgment the trial court had to accept as true a disputed factual interpretation of the 1925 mineral reservation. They argue Hunter's 1925 reservation created in Hunter a single, but two-part, mineral servitude comprised of 75 percent of the minerals on the entire tract, but 100 percent of the mineral production from the nine wells and, additionally, a 25 percent mineral royalty representing the income from the nine then existing wells which Horton and Hodges would have otherwise received. Plaintiffs additionally argue parol evidence is admissible and necessary to explain what the parties intended, thus creating a material fact issue.
Although defendants agree the 1925 Hunter reservation created a single mineral servitude, they dispute plaintiffs' contention that a separate royalty interest was also created.

A. THE 1925 HUNTER MINERAL RESERVATION.
In ruling on the summary judgment, the trial court found the 1925 reservation created "two separate and distinct mineral rights" in Hunter's favor. It did not hold that two mineral servitudes were created. Indeed, the trial court correctly delineated Hunter's rights in and to 75 percent of the minerals in and under the entire tract conveyed and his rights to all the production and income from the reserved wells. The trial court additionally found as a matter of law that although the Hunter reservation may be "inartfully drawn" and "vague" in other respects, the deed clearly reflected Hunter's intention to reserve whatever production, income and other mineral rights he already had for himself. We agree.
Courts are bound to give legal effect to all written contracts according to the parties' true intent. Although summary judgment is generally not appropriate to show the intention of the contracting parties, where the words of a contract are clear, explicit and lead to no absurd consequences, the meaning and intent of the parties must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. See C.C. Arts. 1945 and 2276 (repealed), see now C.C. Arts. 1848 and 2046; see also Texaco, Inc. v. Newton & Rosa Charitable Trust, 471 So.2d 877 (La.App. 2d Cir.), writ denied, 475 So.2d 1104 (La.1985), and Roemer v. Caplis, 369 So.2d 1186 (La.App. 2d Cir.), writ denied, 371 So.2d 620 (La. 1979). In such event, interpretation of the *983 contract is a matter of law. See Bergquist v. Fernandez, 535 So.2d 827 (La.App. 2d Cir.1988).
The 1925 reservation clause is clear and unambiguous concerning what Hunter intended to reserve. At issue is the classification or type of mineral interests he created.
Plaintiffs' contention that Hunter's mineral reservation also created a one-quarter mineral royalty is unfounded. A mineral royalty is not a servitude, but a passive, non-costbearing interest and an inferior and conditional real right which entitles the owner only to participate and share in the gross production of minerals from another's land or from land subject to a mineral servitude owned by another and burdened with such interest when and if production is obtained. Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73 (1949); accord, Mineral Code Art. 80 and related comment.
Any benefit accruing to the mineral royalty owner is solely contingent upon the successful efforts of others. Succession of Goode, 425 So.2d 673 (La.1982); Continental Oil Co. v. Landry, supra; see Mineral Code Art. 81. Additionally, a royalty interest does not include "executive" or operating rights. Horn v. Skelly Oil Co., 224 La. 709, 70 So.2d 657 (1954); Vincent v. Bullock, 192 La. 1, 187 So. 35 (1939); see Mineral Code Art. 21.
In contrast, a mineral servitude is the active right to explore for and produce minerals, extracting and reducing them to possession and ownership. Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207 (1920); Scott v. Hunt Oil Co., 160 So.2d 433 (La.App. 2d Cir.), writ refused, 245 La. 950, 162 So.2d 8 (1964); See now Mineral Code Art. 21; a servitude is a dismemberment of title insofar as it creates a secondary right in the property that is exercised separately from the landowner. See Steele v. Denning, 456 So.2d 992 (La.1984). A mineral servitude also entails "executive" rights.
We hold that Hunter, an oilman himself and owner of mineral interests in nine existing wells, clearly intended to, and did, reserve a 75 percent interest in the right to explore for minerals on the entire tract and 100 percent of the production and 100 percent of the income from the reserved wells in a single mineral servitude that includes the right to continue to receive all production and income from the pre-1925 wells. Gulf Oil Co. v. Clement, 239 La. 144, 118 So.2d 361 (1960); Gunby v. Commercial Solvents Corp., 170 So.2d 259 (La.App. 2d Cir.1964); see also Mineral Code Art. 68.
Plaintiffs further contend that as a result of Hunter's mineral reservation, they became co-owners of Hunter's mineral rights and thus his mineral servitude. We disagree.
In Louisiana, oil and gas in place is not susceptible to absolute ownership. There is no separate mineral estate in or ownership of oil and gas. Leiter Minerals, Inc. v. California Co., 241 La. 915, 132 So.2d 845 (1961); Frost-Johnson Lumber Co. v. Salling's Heirs, supra. The sale or reservation of mineral rights creates only a real right or servitude to go upon the land of another to explore for, produce and reduce to possession the underlying minerals. Nabors Oil & Gas Co. v. Louisiana Oil Refining Co., 151 La. 361, 91 So. 765 (1922); Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co., 149 La. 100, 88 So. 723 (1921); Mineral Code Art. 21.
The right to create a mineral servitude on land belongs exclusively to and may only be created by a landowner who owns the minerals. Mineral Code Art. 24. A mineral servitude, once created, is essentially indivisible. Mineral Code Art. 62 (1972). Even a sale or reservation by a servitude owner of a portion of his rights does not divide the servitude. See Hodges v. Norton, 200 La. 614, 8 So.2d 618 (1942); see now Mineral Code Art. 69. In such event, the parties become co-owners of the rights.
Co-ownership, however, does not exist between the mineral servitude owner (Hunter) and the owner or owners of the land subject to the right (Hodges and Horton) *984 or between the owners of separate mineral servitudes (after the partition, Hunter and Horton). Starr Davis Oil Co., Inc. v. Webber, 218 La. 231, 48 So.2d 906 (1950); Clark v. Tensas Delta Land Co., 172 La. 913, 136 So. 1 (1931); Mineral Code Art. 169.
The record in general and the 1925 deed in particular clearly reflect that Hunter intended to reserve all of his interest in the producing wells for himself to the exclusion of all others in a single and separate mineral servitude. This reservation did not restrict Hunter's right to exercise his servitude rights, but merely provided for ownership of oil and gas production and income to be derived from the nine existing wells. Thus, although Horton and Hodges, as landowners, technically became co-owners of the mineral rights, neither Horton nor Hodges was a "co-owner" of Hunter's mineral servitude. Long-Bell Petroleum Co. v. Tritico, 216 La. 426, 43 So.2d 782 (1949); Steele v. Denning, 445 So.2d 94 (La.App. 2d Cir.), aff'd, 456 So.2d 992 (La.1984); accord, Mineral Code Art. 24.
The Stinson Plaintiffs additionally contend the 1925 conveyance resulted in Horton and Hodges effectively acquiring an interest in Hunter's then outstanding mineral leases, but not on the wells Hunter reserved. Although we may speculate there were mineral leases granted by Hunter in effect in 1925, there are no leases in the record and we have no knowledge of their terms, if they in fact existed. Further, there is no evidence Horton or Hodges ever received any proceeds from the Hunter wells or any leases that might have been in effect.
After the 1925 sale, Horton and Hodges owned 100 percent of the former Hunter tract surface in indivision plus an undivided one-quarter interest in the minerals in and under the property. Their interests, however, were subject to Hunter's mineral servitude as above described. Neither Horton nor Hodges derived their right to explore for minerals by virtue of the Hunter servitude as far as the nine existing Hunter wells were concerned. They became the landowners and succeeded to a fractional interest in the right to explore for minerals as a whole. They each had the right to enter the land, drill for oil and gas and reduce it to possession, subject to their obligation to account to Hunter for 75 percent of the mineral proceeds.

B. THE PARTITION AGREEMENT AND ITS EFFECT.
On the date of the partition deed, May 23, 1944, the Horton/Hodges property consisted of the tracts of land conveyed together in 1925. The partition agreement clearly reflects Horton and the Hodges heirs partitioned their surface and mineral rights formerly held in indivision. Hodges conveyed to Horton the nine-acre tract where Horton's home was located. Horton conveyed to Hodges' heirs all his interest in the surface rights in and to the remaining 556 acres. Additionally, each party specifically but separately reserved "all of the mineral rights" they/he owned prior to the partition transfer in and to the property conveyed to the other.
Defendants contend two separate and distinct undivided one-eighth mineral servitudes were created by the 1944 partition agreement: one in the Hodges heirs' favor on Horton's property and one in Horton's favor on each noncontiguous tract of land constituting the Hodges property. Plaintiffs do not dispute this characterization. However, it is the effect, not the nature of this characterization that is at issue.
As previously stated, the owners of separate mineral servitudes are not co-owners of each other's mineral servitude. Starr Davis Oil Co., Inc. v. Webber, supra; Long-Bell Petroleum Co. v. Tritico, supra; Clark v. Tensas Delta Land Co., supra; Steele v. Denning, supra; Mineral Code Arts. 24 and 169. Numerous mineral servitudes can exist simultaneously as to fractional interests in the same parcels of land. Huckabay v. Texas Co., 227 La. 191, 78 So.2d 829 (1955); Starr Davis Oil Co. v. Webber, supra; Gunby v. Commercial Solvents Corp., supra.
In effect, Horton as a co-owner of the land reserved in the partition one or more mineral servitudes, each consisting of an *985 undivided one-eighth (1/8) mineral servitude affecting each noncontiguous tract of the Hodges property, subject to Hunter's 100 percent interest in the pre-1925 wells and his right to explore for 75 percent of the minerals. Neither Horton nor Hodges was a co-owner of Hunter's mineral servitude, particularly insofar as the Hunter wells are concerned. In any event, there is no indication in the record of any drilling or production during the critical 1944-1954 period preventing prescription from accruing.

V.

PRESCRIPTION FOR NONUSE
Contending their mineral rights did not prescribe in May, 1954, plaintiffs pose several arguments concerning the continued validity of their interests. Plaintiffs essentially contend that since its creation in 1944, the Horton mineral servitude has been maintained by a user sufficient to interrupt prescription and that even now it remains in full force and effect.
Defendants conversely contend, and the trial court found, Horton's mineral servitude prescribed on May 23, 1954 following ten years nonuse. Relying on Mineral Code Arts. 42 and 43 (1975) and citing this court's decision in Producers Oil & Gas Co., Inc. v. Nix, 488 So.2d 1099 (La.App. 2d Cir.), writ denied, 493 So.2d 641 (La.1986), defendants admit Hunter continued production on Hunter's reserved wells, particularly Hunter Well No. 1, but argue that such acts were sufficient to interrupt prescription only as to Hunter's mineral servitude to which such use was appurtenant. Hunter, defendants' argument continues, was a stranger to Horton's mineral servitude under Article 43 and his actions are therefore incapable of and did not constitute sufficient use to interrupt prescription of nonuse on Horton's separate and distinct mineral servitude.
A reservation of minerals is extinguished by prescription of nonuse if not exercised within ten years and a mineral servitude owner then loses his rights unless some event or condition intervened during that time to interrupt the running of prescription. Haynes v. King, 219 La. 160, 52 So.2d 531 (1951); Standard Oil Co. of Louisiana v. Futral, 204 La. 215, 15 So.2d 65 (1943); Arent v. Hunter, supra; Palmer Corp. of Louisiana v. Moore, 171 La. 774, 132 So. 229 (1931); Frost-Johnson Lumber Co. v. Salling's Heirs, supra; see Mineral Code Art. 27. The ten-year prescriptive period begins to run from the date the mineral rights are acquired or created. Ober v. Williams, 213 La. 568, 35 So.2d 219 (1948); Dobbins v. Hodges, supra; Chicago Mill & Lumber Co. v. Ayer Timber Co., 131 So.2d 635 (La.App. 2d Cir.1961); see now Mineral Code Art. 28.
In order to interrupt prescription, Horton was required to use his mineral servitude within ten years after creation or lose it by operation of law. Ohio Oil Co. v. Ferguson, 213 La. 183, 34 So.2d 746 (1947); Scott v. Hunt Oil Co., supra; see Mineral Code Arts. 27, 29, 39, 42 and 43.
Defendants admit Hunter Well No. 1 continued to produce until it was abandoned in January, 1953. Emphasizing this admission, plaintiffs contend Hunter's continued production from Hunter Well No. 1 constituted a use by a user sufficient to interrupt prescription on the Horton mineral servitude. We disagree.
The pleadings, affidavits and answers to interrogatories and answers to requests for admissions of record before us reflect inconsistencies in plaintiffs' claims, but no material issues of fact precluding summary judgment. The Stinson Plaintiffs did not answer the interrogatories propounded to them by defendants. In response to defendants' requests for admissions, the Stinson Plaintiffs denied only generally there had been no good faith or other drilling operations between May 23, 1944 and May 23, 1954 for the discovery and production of minerals on the Hodges property or on lands pooled therewith except for reworking, recompletion or abandonment of the Hunter wells existing prior to 1925. They further generally denied:
there were no obstacles which prevented Horton from drilling on said properties; there had been no oil and gas produced from any well located on the Horton or *986 Hodges property or lands pooled therewith during that period except for production from pre-1925 wells; and
Horton or Hodges heirs had not received royalties or any other payments for mineral produced during that period on such property.
Since the Stinson Plaintiffs failed to respond to defendants' interrogatories, there are no explanations, reasons and facts on the record to support their claims.
The Horton Plaintiffs failed to respond to defendants' requests for admissions. Thus, by operation of law, these requests are deemed admitted. C.C.P. Art. 1467. Responding to defendants' interrogatories, the Horton Plaintiffs claimed to be aware of oil and gas production on the Hodges property between May 23, 1944 and May 23, 1954 based upon information from Horton before his death, but were unaware of any good faith drilling operations except on those Hunter wells that existed before December 1, 1925. Nor were they aware of any obstacles which prevented such drilling. While they claimed Horton received royalty payments from wells located on the Hodges property during that period, they could not then explain the source, stating the "information [was] not yet available."
In response to similar requests for admissions and interrogatories propounded to them by plaintiffs, defendants were also aware, based upon certain documents, that there was production between 1944 and 1954 from one or more Hunter wells, but found no evidence of drilling, reworking, recompleting or abandonment of any wells and no obstacles to the exercise of Horton's servitude rights. Defendants also found no indication that Horton or the Hodges heirs received any royalties during that time.
In opposition to defendants' summary judgment, plaintiffs submitted the affidavits of John Leroy Horton and Ford E. Stinson, Jr. Horton's affidavit, based upon his discussions with his father, reflects only that his father "always claimed one-eighth of the minerals underlying the Hodges/Horton tract" and his father received production proceeds "from wells situated thereon during his lifetime." Although Horton admitted these existing wells were producing on the date his father acquired his interest in the Hunter property and continued to produce thereafter first by one operator and then later by another until the 1950's, he acknowledged that neither his father nor Hodges received royalties from Hunter's pre-1925 wells. Although Horton claimed his father did receive production proceeds from other wells situated on the property "as late as 1986," he did not explain the bases for his claims or the production history of these wells. Ford E. Stinson Jr.'s affidavit generally corroborates John Horton's statements.
Plaintiffs' affidavits are not sufficient to raise material fact issues. Horton's affidavit is not based upon his own personal knowledge as required by law, but upon what his father allegedly told him. See C.C.P. Art. 967.
More importantly, the affidavits do not address the pivotal issue of whether or not good faith drilling efforts were made on the Hodges property by Horton or someone on his behalf during the critical period to prevent prescription from accruing. They reflect only Horton's claim to a mineral servitude. Although Horton allegedly received royalties from some unspecified wells located on the property, the affidavits clearly show Horton never received royalties from the Hunter wells or from any well drilled by or on behalf of Horton between 1944 and 1954.
Further, plaintiffs have not shown whether after 1944 any of the old Hunter wells were reworked, recompleted or otherwise drilled to a deeper depth, and whether, if such occurred, it would constitute good faith drilling activity necessary to prevent the running of prescription on the various tracts of land. Although pleadings on file reflect plaintiffs received royalty payments on wells drilled and producing after 1954, there is no affirmative evidence, other than the Horton Plaintiffs' response to interrogatories and statements in affidavits based upon what Horton had told them, of the possible source of alleged royalty payments *987 from 1944 to 1954 or even that such royalties were, in fact, received.
Alternatively claiming Hunter's reservation is vague concerning the parties' legal relationship and that the Mineral Code is silent as to the nature of the legal relationship which must exist between the mineral servitude owner and the user under Article 43, plaintiffs argue a contractual relationship existed between Hunter, Hodges and Horton under which all revenue from the existing pre-sale Hunter wells would go to Hunter. Continued production on Hunter Well No. 1 was, plaintiffs propose, sufficient to interrupt prescription not only as to Hunter's mineral rights but also those of Horton until it was abandoned in January, 1953. In other words, plaintiffs claim Hunter's continued production inured to their benefit based upon the 1925 contractual (i.e. sale) agreement that Hunter would keep all production and income derived from the nine wells. Plaintiffs argue that even if Hunter received all income and production by agreement, the act of production constitutes a use by user sufficient to interrupt prescription on Horton's servitude.
Defendants contend Horton cannot and could not have benefited from Hunter's continued production on wells Hunter specifically reserved to the exclusion of others. They argue there was no legal relationship sufficient to constitute a use by Horton and interrupt the prescriptive period. Even if such a legal relationship existed, defendants continue, Horton's silence alone was insufficient to constitute a use, particularly where no adoption has been recorded. Mineral Code Arts. 44-46. Thus, defendants argue, since there was no use by user sufficient to interrupt prescription between May, 1944 and May, 1954, the Horton servitude prescribed by nonuse on May 23, 1954, before the Hodges heirs spudded new wells on their property north and east of the Flat River after May, 1954.
This court has previously held the Mineral Code, not the former Civil Code, applies to a determination of whether a mineral servitude was extinguished by prescription resulting from nonuse and that such application did not deprive the mineral rights owner of vested rights or unconstitutionally impair the contract. Producers Oil & Gas Co., Inc. v. Nix, supra, limiting Nelson v. Young, 255 La. 1043, 234 So.2d 54 (La. 1971); see also Pan American Petroleum Corp. v. O'Bier, 201 So.2d 280 (La.App. 2d Cir.), writ refused, 251 La. 227, 203 So.2d 558 (La.1967); Mineral Code Arts. 2, 43 and 214 (1975).
On the basis of Nix, there is no way to construe Hunter's continued production to Horton's benefit. According to the facts and circumstances here presented, Hunter's production was for his exclusive benefit. He was not contractually obligated to Horton. Although plaintiffs, unlike Producers Oil, claim Horton was a co-owner of rights under Hunter's mineral servitude, they have not presented any facts reflecting any such legal relationship may have existed.
As previously noted, once a motion for summary judgment is made and the movant has properly supported his motion, the burden shifts to the adverse party, who cannot then rest on mere allegations or denials contained in his pleadings. He must set forth by way of affidavits or other reasonable evidence specific facts showing a genuine issue of material fact exists for trial. Mere opinion or belief, without more, is not sufficiently certain or probative to justify a trial on the merits.
While plaintiffs are not required on summary judgment to prove prescription was in fact interrupted, which would be their burden at trial on the merits, they are required to show material fact issues exist. Instead, the Horton Plaintiffs in the answers to interrogatories and in brief admit no good faith drilling occurred after 1925 but before May 23, 1954 upon any of tracts of land conveyed and that the only producing well during that period was Hunter Well No. 1, in which Hunter reserved 100 percent interest. As noted, continued operation of this well was appurtenant only to the Hunter mineral servitude and did not inure to the plaintiffs' benefit.
Plaintiffs have not cited, nor has our exhaustive research revealed, any statutory *988 or jurisprudential basis for their contention that plaintiffs' continued receipt of production proceeds on wells drilled after May 23, 1954 and the 35-year delay in asserting prescription either prevented prescription from accruing or otherwise extended the ten-year period. Subsequent drilling by the Hodges' heirs or their lessees following accrual of prescription cannot "revive," "resurrect" or otherwise extend Horton's mineral servitude, which terminated as a matter of law for nonuse on May 23, 1954.
Where mineral rights are not timely exercised, a mineral servitude terminates and is extinguished by ten years prescription of nonuse. The mineral interests then revert back to, or more properly, lapse and the mineral rights again merge with the title held by the landowners at the time prescription accrues. Thereafter, only a new mineral servitude can recreate it. Arent v. Hunter, supra; Standard Oil Co. of Louisiana v. Futral, supra; Palmer Corp. of Louisiana v. Moore, supra; Frost-Johnson Lumber Co. v. Salling's Heirs, supra; Mineral Code Art. 27. Sandefer & Andress, Inc. v. Pruitt, 471 So.2d 933 (La. App. 2d Cir.1985).

VI.

CONCLUSION AND DISPOSITION
We have carefully scrutinized the appellate record to determine what evidence is properly before this court. Affidavits and other documents not submitted to the trial court, as well as allegations in brief, will not be and here have not been considered.
After reviewing the evidence properly before us, we affirm the trial court's granting of the motion for partial summary judgment in defendants' favor. There is no evidence indicating issues of material fact exist warranting a trial on the merits on the prescription issue under the facts and circumstances of this case. Therefore, defendants are entitled to recordable evidence of the lapse the plaintiffs' mineral interest. Mineral Code Art. 206A.
At plaintiffs' costs, the decision of the trial court is
AFFIRMED.

APPLICATION FOR REHEARING
Before NORRIS, LINDSAY, HIGHTOWER, VICTORY and BROWN, JJ.
Rehearing denied.
NOTES
[1] The two groups of plaintiffs are sometimes hereinafter referred to as "the Horton Plaintiffs" and "the Stinson Plaintiffs." Except as otherwise specifically indicated, they are collectively referred to simply as "plaintiffs."
[2] We recognize that the land Hunter conveyed in 1925 may be comprised of several noncontiguous tracts of land. We note that a single mineral servitude may not be created or reserved on two or more noncontiguous tracts of land, [Lee v. Giauque, 154 La. 491, 97 So. 669 (1923); Arent v. Hunter, 171 La. 1059, 133 So. 157 (1931), U.S. cert. denied, 284 U.S. 580, 52 S.Ct. 28, 76 L.Ed. 502 (1931); Mineral Code Art. 73] and that such a reservation of mineral rights on several noncontiguous tracts of land creates separate and distinct servitudes on each tract. Dobbins v. Hodges, 208 La. 143, 23 So.2d 26 (1945); Hunter Co. v. Ulrich, 200 La. 536, 8 So.2d 531 (1942). This is true even though the right to share in production and income varies as to different portions of the tract or different horizons, strata or levels. Gulf Oil Corp. v. Clement, 239 La. 144, 118 So.2d 361 (1960); Gunby v. Commercial Solvents Corp., 170 So.2d 259 (La.App. 2d Cir.1964; see also Mineral Code Art. 68. Accordingly, although a single, but separate, mineral servitude may have been created as to each noncontiguous tract, we shall assume for our purposes here without deciding that the entire property was one contiguous tract of land.
[3] The record indicates these producing unit wells were created after May, 1954 by order of the Louisiana Commissioner of Conservation and located in a state-designated conservation unit in Elm Grove Field where the Hodges property is located.
[4] Following the granting of Mobley's peremptory exception of failure to join indispensable parties (i.e., all other owners of real rights in and to the subject property), plaintiffs amended their petition, adding as parties defendant Hodges' heirs and their successors in interest and their mineral lessees.
[5] Subsequently discovering that production proceeds from the unit wells had been paid to the plaintiffs by their mineral lessees, defendants amended their reconventional demand and requested an order requiring plaintiffs to account for all royalties erroneously paid to them.
[6] Expressing no opinion as to the merits of plaintiffs' claim, we also stated appellant's proper remedy, if any, is through an action for nullity. If, after review of the record properly before us on appeal, this court determines that remand is necessary, a case will be remanded regardless of whether a formal motion and order for same has been filed.